UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**TROY WALKER and JOAN WALKER,** his wife,

      **Plaintiffs,**

vs.

**YAMAHA MOTOR CO., LTD.,
YAMAHA MOTOR CORPORATION, U.S.A.,
ED TUCKER DISTRIBUTOR, INC.;
MHR HELMETS/JIANGMEN
PENGCHENG HELMETS LIMITED,**

      **Defendants.**
_____/

CASE NO. 6:13-CV-1546-ORL-37-RBD-GJK

## DEFENDANTS', YAMAHA MOTOR CORPORATION, U.S.A. AND YAMAHA MOTOR CO., LTD., TRIAL BRIEF[1]

Defendants, **YAMAHA MOTOR CORPORATION, U.S.A.** ("YMUS") and **YAMAHA MOTOR CO., LTD.** ("YMC") (collectively the "Yamaha Defendants"), in an effort to assist the Court in better understanding the facts and law applicable to the above-styled cause, hereby serve their Trial Brief and state as follows:

### I. INTRODUCTION

In the early afternoon of May 1, 2010, Plaintiff, Troy Walker, test drove a 2004 Yamaha Road Star Silverado motorcycle (the "Subject Motorcycle") as part of his job at The Motorcycle Clinic. With the headlight illuminated on the low-beam setting, Mr. Walker traveled down Vine Street, a six-lane road, while 73-year-old Laura Rodriguez positioned her sports utility vehicle to make a u-turn in a dedicated left turn lane from the opposite direction of Vine Street.

---

[1] This Trial Brief intends to address issues which have not been raised in other motions before the Court.

Despite being the only vehicle in the turn lane, Ms. Rodriguez stopped approximately 59 feet before the point where the turn lane intersects with Vine Street. Looking toward the oncoming traffic, Ms. Rodriguez saw Mr. Walker on the Subject Motorcycle approximately 500 feet away. Yet, without looking back to the oncoming traffic at any point again to check for vehicles, Ms. Rodriguez—in her own words—very slowly attempted to perform a u-turn, and in doing so, caused Mr. Walker and Ms. Rodriguez to collide.

## II.   STATEMENT OF FACTS [2]

Andrew Bennett—the owner of the Subject Motorcycle—purchased the motorcycle "used" through a private sale approximately a year and a half before the subject crash and had not made any modifications to the motorcycle. Mr. Bennett never experienced any issues with the brakes, lights, fuses, or battery of the motorcycle, nor had the motorcycle ever been damaged or in any accidents prior to or during his ownership.

The lighting system on the Subject Motorcycle included a single, center-mounted headlight that is equipped to be used either in the standard low-beam setting or high-beam setting. The headlight is designed to be always "on" in the standard, low-beam mode and can be switched to the high-beam mode. The lighting system on the front of the Subject Motorcycle also includes directional signal lights (turn signals) that are mounted to a bar positioned below the headlight and also function as running lights which are also always "on."

Following the accident, Ms. Rodriguez voluntarily gave a recorded statement to law enforcement pursuant to a criminal investigation. Ms. Rodriguez stated that she saw the motorcycle approaching while she was in the left turn lane and had sufficient time to

---

[2] A more detailed presentation of the facts of this case is available in the Yamaha Defendants' Motion for Summary Judgment. [DE 152 at 2-8].

complete her turn without interfering with the travel of the motorcycle. Ms. Rodriguez was also deposed and has testified repeatedly that she had no problem seeing the motorcycle as it was approaching. Ms. Rodriguez also testified that there was nothing blocking or obstructing her view of the oncoming traffic that day and that she simply executed her turn "very slowly."

Plaintiffs' Complaint contains counts for both strict liability and negligence, alleging that the Yamaha Defendants, negligently designed, manufactured, sold and/or distributed the subject 2004 Yamaha Road Star Silverado by failing to have a safely designed conspicuity system which would provide better visual awareness of the motorcycle and/or failing to equip the motorcycle with an alternatively designed safety system for increased speed spacing judgment and motorcycle conspicuity.

The Yamaha Defendants each filed separate Answers and Affirmative Defenses to Plaintiffs' Second Amended Complaint, denying all relevant allegations and asserting, among others, the following affirmative defenses: (1) that "the negligence of another, not of this Defendant, caused or contributed to the loss alleged; and that such negligence of another was the sole proximate cause or an independent intervening cause of the loss alleged"; and (2) that the product "was manufactured in a reasonably safe manner in full compliance with all applicable laws, statutes, and regulations and, hence, Plaintiffs may not recover."

### III. LEGAL ISSUES

#### A. CLARIFYING WHICH CLAIMS REMAIN.

Plaintiffs have dropped any claims relating to the Subject Motorcycle's braking system and warnings. [DE 165]. As such, what remains pending against the Yamaha Defendants are claims that the Subject Motorcycle was defectively designed and/or

3

manufactured. Specifically, Plaintiffs allege that the lighting conspicuity system on the Subject Motorcycle was defectively designed and/or manufactured in such a way that it caused the accident at issue in this case.

While Plaintiffs have alleged that the Subject Vehicle was defectively designed and manufactured, Plaintiffs have never actually advanced the defective manufacturing claim. Indeed, Plaintiffs' own experts have all testified that they have no opinions that the Subject Vehicle was defectively manufactured. *See* Wright Depo. at 74; Meinschein Depo. at 30; Hancock Depo. at 16.

Defective design and defective manufacturing are two different claims with different standards. *See Pinchinat v. Graco Children's Prods., Inc.*, 390 F. Supp. 2d 1141, 1146 (M.D. Fla. 2005) ("Strict liability in Florida includes three distinct components. '[A] product may be defective by virtue of a design defect, a manufacturing defect, or an inadequate warning.'" (citation and quotation marks omitted)); *Benitez v. Synthes, Inc.*, 199 F. Supp. 2d 1339, 1344 (M.D. Fla. 2002) ("Manufacturing defects are generally limited to situations where something goes wrong in the manufacturing process and can be distinguished from other types of product liability claims such as design defects and inadequate warning defects." (footnote omitted)); *Pulte Home Corp. v. Ply Gem Indus., Inc.*, 804 F.Supp. 1471, 1488 (M.D. Fla. 1992) ("A design defect arises when due to a design error the product as manufactured gives rise to an unforeseen hazard. A manufacturing defect is an unexpected malfunction of the product as designed under foreseeable use and such a defect is not alleged in this case." (citation omitted)). As Plaintiffs have effectively abandoned any claim of manufacturing defect, the only claim that remains is that of a design defect.

> B. **BECAUSE THE LIGHTING ON THE SUBJECT MOTORCYCLE COMPLIED FULLY WITH FMVSS 108'S REQUIREMENTS, THE GOVERNMENT RULES DEFENSE PROVIDES A STATUTORY, REBUTTABLE PRESUMPTION THAT THE SUBJECT MOTORCYCLE WAS NOT DEFECTIVE OR UNREASONABLY DANGEROUS.**

Section 768.1256, Florida Statutes, otherwise known as the "Government Rules Defense," provides the following:

> (1) In a product liability action brought against a manufacturer or seller for harm allegedly caused by a product, there is a rebuttable presumption that the product is not defective or unreasonably dangerous and the manufacturer or seller is not liable if, at the time the specific unit of the product was sold or delivered to the initial purchaser or user, the aspect of the product that allegedly caused the harm:
>
> (a) Complied with federal or state codes, statutes, rules, regulations, or standards relevant to the event causing the death or injury;
>
> (b) The codes, statutes, rules, regulations, or standards are designed to prevent the type of harm that allegedly occurred; and
>
> (c) Compliance with the codes, statutes, rules, regulations, or standards is required as a condition for selling or distributing the product.

Federal Motor Vehicle Safety Standard (FMVSS) 108, entitled, "Lamps, reflective devices, and associated equipment," provides safety standards for motorcycle lighting, which specifically includes conspicuity. The "Purpose" section of this regulation plainly states as such:

> S2 Purpose. The purpose of this standard is to reduce traffic accidents and deaths and injuries resulting from traffic accidents, by providing adequate illumination of the roadway, and **by enhancing the conspicuity of motor vehicles on the**

5

> **public roads so that their presence is perceived and their signals understood**, both **in daylight** and in darkness or other conditions of reduced visibility.

49 CFR § 571.105(S2) (emphasis added). While Plaintiffs undoubtedly will contest whether FMVSS 108 relates to motorcycle conspicuity, the plain language of the intent of the regulation is unambiguous. Further, in *Byrnes v. Honda Motor Co.*, 907 F.Supp. 1525 (S.D. Fla. 1995), another motorcycle lighting conspicuity case which Plaintiffs have previously cited favorably, the court concluded that FMVSS 108 governed motorcycle conspicuity:

> The Safety Act requires the Secretary of Transportation to establish "appropriate motor vehicle safety standards." 15 U.S.C. § 1392(a). Pursuant to this authority, Federal Motor Vehicle Safety Standard § 108 ("FMVSS § 108") was enacted. FMVSS § 108 governs motorcycle headlamps and light configurations, and was enacted "to reduce traffic accidents . . . by enhancing the conspicuity of motor vehicles on the public roads so that their presence is perceived and their signals understood, both in daylight and in darkness . . . . 49 C.F.R. § 108(S)(2)." **The parties do not dispute that the Congressional intent of FMVSS § 108 is to enhance the conspicuity of motorcycles by mandating specific lighting requirements for motor vehicles, including motorcycles. Consequently, there is no genuine issue of material fact that motorcycle conspicuity is the same "aspect of performance" which is the subject matter of plaintiff's claim in the case at bar.**

*Id.* at 1526 n.2; *see also Buzzard v. Roadrunner Trucking, Inc.*, 966 F.2d 777, 784 (3d Cir. 1992) ("In order to accomplish this purpose [stated in 49 CFR § 571.105(S2)], Standard 108 describes in detail the illumination equipment required to reach the necessary level of conspicuity."); *Crowe v. Fleming*, 749 F.Supp. 1135, 1140 (S.D. Ga. 1990) ("The purpose of FMVSS 108 is to insure safety by enhancing conspicuity of vehicles on the roads.").

The Subject Motorcycle met all of the requirements of FMVSS 108.[3] This has not been, and should not be, a point of contention in this case. In fact, Plaintiffs' expert, Robert Wright, testified that the lighting of the Subject Motorcycle fully complied with FMVSS 108's requirements. Because the Subject Motorcycle met FMVSS 108's conspicuity lighting requirements, the Yamaha Defendants are entitled to the rebuttable presumption found in section 768.1256, Florida Statutes, that the Subject Motorcycle was *not* defective. That is the prism through which this entire case should be evaluated and analyzed.[4]

### C. PLAINTIFFS CANNOT MEET THEIR BURDEN OF PROVING EITHER THAT THE SUBJECT MOTORCYCLE WAS DEFECTIVE OR THAT ANY ALLEGED DEFECT CAUSED THE ACCIDENT.[5]

#### 1. Governing Law.

The elements of a defective product claim are as follows:

> To sustain a claim of defective product, whether alleging strict products liability . . . or negligence, a plaintiff must demonstrate that (1) a defect existed in the product, (2) the defect caused injury, and (3) the defect in the product existed at the time the product left the possession of the manufacturer.

*Cooper v. Old Williamsburg Candle Corp.*, 653 F. Supp. 2d 1220, 1223 (M.D. Fla. 2009). Thus, it is Plaintiffs' burden to prove that the Subject Motorcycle's lighting configuration is defective and that this lighting configuration caused the accident.

---

[3] Florida provides state-level standards regarding motorcycle lighting. See §§ 316.233(4), 316.2395, 316.400(1), 316.430, Fla. Stats. However, these do not directly address conspicuity and are thus not asserted by the Yamaha Defendants as a basis for the government rules defense rebuttable presumption.

[4] As discussed in Yamaha's Reply Brief in Support of Summary Judgment, Plaintiffs' cannot contend that FMVSS 108 is simply a "minimum" standard because it provides both minimum and maximum lighting requirements to avoid lighting being too intense thus creating dangers to other motorists.

[5] The Yamaha Defendants have already argued extensively regarding the Plaintiffs' dearth of evidence of a defect and causation in their Motion for Summary Judgment. [DE 152] So as to not repeat this lengthy argument to the Court, the Yamaha Defendants direct the Court to pages 9 through 24 of the Motion for Summary Judgment, which discusses this issue. Instead, only a summary of this argument is presented herein.

"At the heart of each [defective product] theory is the requirement that the Plaintiffs' injury must have been caused by some defect in the product" –

> Generally, **when the injury is in no way attributable to a defect, there is no basis for imposing product liability upon the manufacturer**. It is not contemplated that a manufacturer should be made the insurer for all physical injuries caused by his products.

*Royal v. Black & Decker Mfg. Co.*, 205 So. 2d 307, 309 (Fla. 3d DCA 1967), *cert. denied*, 211 So. 2d 214 (Fla. 1968).

Similarly, to prove any products liability claim sounding in negligence, whether negligent design or negligent manufacture, a plaintiff must establish: (1) that the defendant owed a duty of care toward the plaintiff; (2) that the defendant breached that duty; (3) that the breach was the proximate cause of the plaintiff's injury; and (4) that the product was defective or unreasonably dangerous. *Cooper v. Old Williamsburg Candle Corp.*, 653 F. Supp. 2d 1220, 1226 (M.D. Fla. 2009).

Plaintiffs cannot and will not meet their burden.

### 2. No Proof of Defect.

"Under Florida law, to prevail in a products liability case for either negligence or strict liability, the plaintiff must establish a defect in the subject product . . . ." *Fagundez v. Louisville Ladder, Inc.*, 2011 WL 6754089 (S.D. Fla. Dec. 22, 2011). Additionally, a design defect must be proven by expert testimony. *Id.* ("Design defects must be proven by expert testimony.") (citations and quotation marks omitted).

Two of Plaintiffs' experts testified that they have no opinion regarding whether the subject motorcycle contained a design defect. *See* Meinschein Depo. at 30; Hancock Depo. at 228.

8

All that leaves for Plaintiffs' evidence is Robert Wright, "Force Analysis and Dynamics" expert, who opined that the subject motorcycle contained a design defect because it contained a single headlight. *See* Wright Depo. at 72. However, Wright's statements as to the alleged defect are classic conclusory statements which are inadequate to create a jury question on this issue. An expert's conclusory statements are inadequate evidence. *See, e.g., Mount Sinai Med. Ctr. of Greater Miami, Inc. v. Gonzalez*, 98 So. 3d 1198, 1202-03 (Fla. 3d DCA 2012) (rejecting expert testimony at trial because "[i]t is totally obvious that this testimony was not only well beyond the witness's supposed expertise but totally conclusory in nature and . . . unsupported by any discernable, factually-based chain of underlying reasoning." (citation and quotation marks omitted)).

Wright admitted that he performed absolutely **no** testing in this case. *See* Wright Depo. at 237, 243. Instead, Wright offered two explanations for his conclusion that the Subject Motorcycle was defectively designed, neither of which is sufficient: First, Wright believes that any motorcycle that is equipped with a single headlight, regardless of the size, placement, or brightness of the light, is defective. *See, e.g.,* Wright Depo. at 96. However, Florida courts have repeatedly rejected any argument that a product is defective merely because there are possible alternatives that may be safer. *See, e.g., Hernandez v. Altec Envtl. Prods., LLC*, 903 F. Supp. 2d 1350, 1360 (S.D. Fla. 2012) ("Products liability does not make the manufacturer an insurer of all foreseeable accidents which involve its product. Virtually any product is capable of producing injury when put to certain uses or misuses . . . . [T]he availability of an alternative design does not translate into a legal duty in products liability. An action is not maintainable in products liability merely because the design used was not the safest possible." (citation and quotation marks omitted)).

Second, Wright piggy-backs onto the work done by Peter Hancock, another of Plaintiffs' experts. Hancock created a video of three motorcycles, none of which are the Subject Motorcycle, driving down the same area in which the accident occurred, and Wright has offered his subjective, personal opinions about which motorcycles he could personally see better. *See* Wright Depo. at 120, 191-93. This purely subjective, entirely anecdotal observation by Wright is nothing more than a conclusion without analysis or any factual basis.

Further, Plaintiffs cannot even meet the simple requirement that they prove there was not a material change in the condition of the motorcycle from the time it was designed and manufactured. Plaintiffs' experts had no idea whether the headlight on the subject motorcycle was the same as the headlight designed by Yamaha. Additionally, there is no evidence whether the daytime running lamps were working on the day of the accident. Since Plaintiffs failed to preserve the motorcycle, these issues cannot be known.

To compound the lack of basis for Plaintiffs' experts' opinions, they tested a 2003 Yamaha motorcycle that did not have functioning running lights and which they did not verify the headlamp was the one designed to be on the exemplar motorcycle when new. Simply, there is no evidence that the exemplar motorcycle had substantially similar lighting as the motorcycle Troy Walker was riding on the day of the accident. Since Plaintiffs' experts relied upon this exemplar's lighting in reaching their opinions, these opinions are unreliable.

Disregarding Wright's conclusory statements, which is precisely the weight they should be afforded, Plaintiffs have no expert testimony regarding a design defect. Without

expert testimony regarding a design defect, Plaintiffs cannot meet their first burden to prove the existence of a defect and their case must fail.

### 3. No Proof of Causation.

Proximate causation consists of two elements: cause-in-fact and foreseeability. *Coker v. Wal-Mart Stores, Inc.*, 642 So. 2d 774 (Fla. 1st DCA 1994). Proximate causation "is concerned with whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred." *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992); *see also Stahl v. Metro. Dade Cnty.*, 438 So. 2d 14 (Fla. 3d DCA 1983) (recognizing that "there can be no liability for any tort unless it be shown that the defendant's act or omission was a cause-in-fact of the plaintiff's claimed injuries."). Accordingly, Florida courts have historically followed the so-called "but for" causation-in-fact test, that is, "to constitute proximate cause there must be such a natural, direct, and continuous sequence between the negligent act [or omission] and the [plaintiff's] injury that it can reasonably be said that *but for* the act [or omission] the injury would not have occurred." *Pope v. Pinkerton-Hays Lumber Co.*, 120 So. 2d 227 (Fla. 1st DCA 1960).

Importantly, Plaintiffs have the burden to prove causation:

> Plaintiff must "introduce evidence which affords a **reasonable basis** for the conclusion that it is more likely than not that the conduct of the defendant was a **substantial factor** in bringing about the result. **A mere possibility of such causation is not enough**; and when the matter remains one of **pure speculation or conjecture**, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant."

*See Steffen v. Akerman Senterfitt*, 2005 WL 3277894 (M.D. Fla. Dec. 2, 2005) (emphasis added) (quoting *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984)).

Plaintiffs allege that the Yamaha Defendants negligently designed the Subject Motorcycle by failing to include a lighting system that provided increased conspicuity. However, there is **no** evidence that the allegedly defective lighting system on the Subject Motorcycle caused or substantially contributed to the accident. In other words, there is no evidence that Ms. Rodriguez (1) would have noticed and perceived a change in the subject motorcycle's lighting system, and (2) would have acted **any differently** in executing the turn. Both of these causal elements amount to nothing more than pure speculation, which is actually contradicted by the evidence in this case.

Ms. Rodriguez—the only individual qualified to testify as to what she saw and perceived—has repeatedly testified that she saw the motorcycle approaching. In her deposition, Ms. Rodriguez does not describe a problem perceiving the speed of the motorcycle or misjudging the time available to make the turn, as has been alleged in this matter. Instead, Ms. Rodriguez has remained steadfast in her testimony that she simply executed the turn too slowly. Moreover, Ms. Rodriguez testified that she was sitting in the left turn lane far enough back that she could still see the arrow on the ground in front of her waiting for traffic to clear. This additional distance would also have naturally increased the time for executing a turn compared to a driver stopped at the opening.

In short, the undisputed, substantial evidence demonstrates that Ms. Rodriguez took the turn too slowly, as well as too widely, and inexplicably stopped her vehicle in a position that unnecessarily extended the time to execute the turn.

Despite this undisputed evidence, Plaintiffs' expert, Robert Wright, has testified that he knows that the accident would not have occurred if the motorcycle had a different lighting system. *See* Wright Depo. at 107. When pressed on the issue, Wright eventually admitted

that he had no basis for predicting what Ms. Rodriguez would or would not have done if presented with a different lighting configuration on the date of the incident. *See* Wright Depo. at 237-38. Essentially Wright's opinion is just generally that different lighting configurations can affect a vehicle's conspicuity—an uncontroverted proposition. With respect to this specific case, however, Wright is unable to testify as to what Ms. Rodriguez would have done if the Subject Motorcycle were equipped with different lighting or to even opine that Ms. Rodriguez' actions were the result of the lighting configuration on the motorcycle. Peter Hancock, another of Plaintiffs' experts, also acknowledged that he has no basis for testifying whether Ms. Rodriguez would have pulled out in front of Mr. Walker under different circumstances. *See* Hancock Depo. at 71-72.

Wright's opinions regarding causation should not and cannot form the basis for Plaintiffs' case. Under Florida law, a witness may not offer this type of conjectural testimony about what he or she would have done under different circumstances because this type of testimony is simply speculation. *See LeMaster v. Glock, Inc.*, 610 So. 2d 1336, 1338 (Fla. 1st DCA 1992) ("It has long been the rule that a witness's opinion as to what would have happened if circumstances were different constitutes rank speculation that is not competent evidence[.]"); *Dracket Products Co. v. Blue*, 152 So. 2d 463, 465 (Fla. 1963) ("A statement by a witness as to what action he would have taken if something had occurred which did not occur . . . or what course of action a person would have pursued under certain circumstances which the witness says did not exist will ordinarily be rejected as inadmissible and as proving nothing."). While it is pure speculation for a witness to testify about what he or she would have done under different circumstances, it is even more speculative for a third

13

party to essentially guess what another individual would have done, which is precisely what Plaintiffs' base their entire case upon.

In short, there is absolutely no evidence that the design of the lighting system or conspicuity of the Subject Motorcycle caused or contributed to this crash event in any way. *See Osorio v. Dole Food Co.*, 665 F. Supp. 2d 1307, 1332 (S.D. Fla. 2009) ("Without proof of causation, the link between the plaintiff's injury and the defendant's conduct is purely speculative, and any damages awarded necessarily occur without due consideration for the defendant's fault.").

### IV.    THE YAMAHA DEFENDANTS' EXPERT WITNESSES

Kevin Breen, the Yamaha Defendants' expert regarding conspicuity and lighting, will testify that the lighting configuration on the Subject Motorcycle met the requirements of FMVSS 108 which has both minimum and maximum light intensity requirements. Further, he will testify that the Subject Motorcycle's lighting configuration was consistent with the approach utilized by other companies. Additionally, Breen has concluded that the Subject Motorcycle's lighting configuration did not cause or contribute to the accident in this case.

Breen will also testify that the exemplar motorcycle used by Dr. Hancock in his evaluations did not have the same lighting configuration as that of the Subject Motorcycle, which renders any comparisons between the two improper.

Kris Kubly, motorcycle design expert, will testify that the lighting configuration of the Subject Motorcycle was not defective. Kubly has concluded that various aspects of the Subject Motorcycle's front-end design, including its entire forward lighting system and multiple reflective surfaces, made the Subject Motorcycle easy to detect and evaluate in daytime conditions. Breen has also concluded that auxiliary forward lighting, such as

14

passing lamps, are not widely installed as original equipment by motorcycle manufacturers and, when they are, are limited to select models.

Kubly will also testify that the position in which Ms. Rodriguez stopped before beginning the u-turn—59 feet back from the intersection opening—added 8 or possibly more seconds of time to the overall duration of the turn.

The Yamaha Defendants' accident reconstructionist, Tom Carter, will testify that Mr. Walker was driving the Subject Motorcycle at approximately 45 miles per hour prior to the impact. Further, he will testify that based on the stopping position of Ms. Rodriguez before starting the u-turn, at least 7 seconds elapsed from the time she began the turn to the point of impact, which indicates that Mr. Walker was at least 500 feet away when Ms. Rodriguez observed him.

Finally, Nathan Dorris, the Yamaha Defendants' human factors engineering expert, will testify that the Subject Motorcycle's visibility and conspicuity characteristics were both reasonable and appropriate. Further, Dorris concluded that the daytime running lights, the headlight, and the reflective surfaces of the Subject Motorcycle, all made it salient and visible to other motorists during daytime conditions. Dorris also found that the scientific literature on this topic does not support Plaintiffs' theory that the Subject Motorcycle lacked additional lighting. Analyzing Ms. Rodriguez's execution of the left turn, Dorris will testify that the evidence indicates that the accident occurred because she executed the turn too slowly and did not look again to verify Mr. Walker's position.

## V.     CONCLUSION

The accident that occurred in this case was undoubtedly tragic for Mr. Walker and his family. However, the testimony and evidence at trial will not prove that the Subject

Motorcycle was defectively designed or defectively manufactured. Additionally, Plaintiffs' complete dearth of evidence regarding causation will further vindicate that the Subject Motorcycle's lighting configuration was not defective and that the Yamaha Defendants should not be held liable for this unfortunate incident.

                              Respectfully submitted,

                              *s/ Frank D. Hosley*
                              **JOHN C. SEIPP, JR.**
                              Florida Bar No. 289264
                              john.seipp@bowmanandbrooke.com
                              **FRANK D. HOSLEY**
                              Florida Bar No. 078972
                              frank.hosley@bowmanandbrooke.com
                              **NHAN T. LEE**
                              Florida Bar No. 0596061
                              nhan.lee@bowmanandbrooke.com
                              **JON J. HERNAN**
                              Florida Bar No. 658588
                              jon.hernan@bowmanandbrooke.com
                              **BOWMAN AND BROOKE LLP**
                              1064 Greenwood Boulevard, Suite 212
                              Lake Mary, FL  32746-5419
                              (407) 585-7600
                              (407) 585-7610
                              Attorneys for Defendants,
                              **YAMAHA MOTOR CO., LTD. and**
                              **YAMAHA MOTOR CORPORATION, U.S.A.**

## **CERTIFICATE OF SERVICE**

    ***I HEREBY CERTIFY*** that on February 11, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system and that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

                              *s/ Frank D. Hosley*
                              **FRANK D. HOSLEY**
                              Florida Bar No. 078972
                              frank.hosley@ bowmanandbrooke.com